OPINION
{¶ 1} James R. Marriott was convicted by a jury in the Clark County Court of Common Pleas of two counts of aggravated burglary, in violation of R.C. 2911.11(A)(1), a first degree felony. The court sentenced him to eight years in prison on each count, to be served concurrently, and to pay a fine of $2,500, restitution in the amount of $3,000, and court costs. *Page 2 
 {¶ 2} Marriott appeals, arguing that his convictions were based on insufficient evidence and were against the manifest weight of the evidence and that his sentence was inconsistent with the sentences received by his co-defendants. For the following reasons, the judgment will be affirmed.
 I {¶ 3} On September 28, 2007, Betty and Bill McCreary, who were 75 and 79 years old, respectively, resided at 3429 Christina Drive in the Brookwood Mobile Home Park in New Carlisle (Clark County). Between 8:30 p.m. and 9:00 p.m., Mrs. McCreary was preparing for a bus trip that she was planning to take the following day while her husband was using the computer in another room.
 {¶ 4} As Mrs. McCreary was packing, she heard a knock on her front door. She opened the door to find a man standing at the door and two other men standing behind him. The man at the door was later identified as Dustin Cable; the other two men were later identified as Joshua Kelsey, the McCrearys' former step-grandson, and Marriott.
 {¶ 5} Cable asked Mrs. McCreary if she had a car missing. Mrs. McCreary responded that she did not, but her son did. Cable then asked her, "Harold Bartley?" When Mrs. McCreary responded affirmatively, Cable told her to "look out here." As Mrs. McCreary looked, the three men ran into the house; Mrs. McCreary noticed that the two men who had been standing behind Cable were wearing masks.
 {¶ 6} The first man into the house pushed Mrs. McCreary onto her couch, pulled her hair, slapped her, and told her, "You sit there." Mrs. McCreary began to scream and holler, "Who are you? What are you doing here? We don't know you." Upon hearing a commotion, *Page 3 
Mr. McCreary left the computer room and headed into the short hallway toward his wife. One of the men hit him, knocking him unconscious. When Mr. McCreary began to "come out of it," two men were shouting at him, "Where's your safe?" The men hit Mr. McCreary a second time, causing him to lose consciousness again.
 {¶ 7} Fearing that the men "were going to beat [her] husband to death," Mrs. McCreary ran to a neighbor's home to call the police. When Mr. McCreary regained consciousness, no one was in the house. He located his wife at the neighbor's home. After Mrs. McCreary returned to her house, she discovered that $8,000 in jewelry and her purse were missing. Her purse had contained approximately $700, her identification, her social security card, and credit cards.
 {¶ 8} Cable and Kelsey pled guilty to burglary for committing the offense at the McCrearys' home. Both identified Marriott as the third participant in the home invasion. Marriott was also identified by Randy and Dawn Sinclair, other residents of Christina Drive, as being in a vehicle with Cable and another person on Christina Drive shortly before the burglary.
 {¶ 9} On November 20, 2007, Mariott was indicted on two counts of aggravated burglary. After a jury trial, Marriott was convicted of both counts. As stated above, the court sentenced him to eight years in prison on each count, to be served concurrently.
 II {¶ 10} Marriott's first assignment of error states:
 {¶ 11} "THE VERDICT OF GUILTY WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 12} "A sufficiency of the evidence argument disputes whether the State has presented *Page 4 
adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law." State v.Wilson, Montgomery App. No. 22581, 2009-Ohio-525, at ¶ 10, citingState v. Thompkins, 78 Ohio St.3d 380, 386, 1997-Ohio-52. When reviewing whether the State has presented sufficient evidence to support a conviction, the relevant inquiry is whether any rational finder of fact, after viewing the evidence in a light most favorable to the State, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430,1997-Ohio-372, citing Jackson v. Virginia (1979), 443 U.S. 307, 319,99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 13} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."Wilson at ¶ 12. When evaluating whether a conviction is contrary to the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Thompkins, 78 Ohio St.3d at 387, citing State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 14} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. State v.Lawson (Aug. 22, 1997), Montgomery App. No. 16288. However, we may determine which of several competing inferences suggested by the evidence should be preferred. Id. *Page 5 
 {¶ 15} The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. Wilson at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin, 20 Ohio App.3d at 175.
 {¶ 16} Marriott claims that the State failed to present sufficient evidence to support his convictions and that his convictions were against the manifest weight of the evidence, because the only evidence of his presence at the McCrearys' home was the testimony of his co-defendants, Cable and Kelsey. Marriott emphasizes that "[b]oth co-defendants admitted that they were drunk and using drugs on the day of the incident, and one of the two stated on the witness stand that he was not even sure that the third man at the scene was actually Mr. Marriott."
 {¶ 17} At trial, Betty McCreary testified that three men participated in the aggravated burglary, and the police were contacted at approximately 8:47 p.m. Cable was not wearing a mask, and she subsequently recognized his photograph when it was aired in a television newscast. Mr. and Mrs. McCreary both believed that one of the masked men was Kelsey.
 {¶ 18} Kelsey testified that, on the day of the offense, he had begun drinking at approximately 10 a.m. and continued to drink whiskey and take pills throughout the day. "At some point," he "hooked up with" Marriott and Cable, and they went to a liquor store in Huber Heights with Stacey Ferguson, Kelsey's then-girlfriend. Sometime afterward, they went to John Street in New Carlisle. Later that day, the three went to Christina Drive because Kelsey "was planning on robbing Betty and Bill McCreary." Kelsey believed the McCrearys had a safe in their residence. Kelsey testified that they drove by the McCrearys' residence in Ferguson's *Page 6 
vehicle to see if anyone was home. He recalled "speaking with a lady on Christina Drive" about directions and returning to John Street. Afterward, they returned to Christina Drive, went into the McCrearys' home, and committed the robbery. Kelsey testified that he "believed to the best of his knowledge" that Marriott and Cable had been with him prior to, during, and after the burglary, but he "could be wrong."
 {¶ 19} Kelsey further testified that he had spoken with Detective Brumfield of the Clark County Sheriff s Office after his arrest. At that time, Kelsey had agreed that Marriott and Cable had entered the McCrearys' residence with him. Kelsey also acknowledged at trial that he had stated during his grand jury testimony that he was positive that Cable and Marriott had participated in the burglary.
 {¶ 20} Kelsey indicated that he had pled guilty to burglary, a third degree felony, and that he was serving a three-year sentence for the offense. He stated that the plea offer was made in exchange for agreeing to cooperate in the prosecution of others.
 {¶ 21} Cable also testified at Marriott's trial pursuant to a plea agreement with the State. Cable testified that he was drinking with Mariott and Kelsey for "pretty much half the day," and that, for a while before the burglary, they were at Kelsey's trailer in the Honey Creek Mobile Home Park with Ferguson. There, Kelsey told the others that he wanted "to rob somebody" and that he wanted to steal the McCrearys' safe. Cable testified that Marriott was present during these conversations.
 {¶ 22} Consistent with Kelsey's testimony, Cable also stated that he, Kelsey and Marriott drove by the McCrearys' house prior to committing the burglary and that they had stopped and talked with some of the McCrearys' neighbors. According to Cable, the three later *Page 7 
returned to the McCrearys' residence with Ferguson, who remained in the car. Cable described going to the door, talking with Mrs. McCreary about a car, and how Marriott and Kelsey "just ran in the house." Cable stated that he heard Mrs. McCreary saying, "Why are you dong this? Why is this happening?" He then returned to the car and waited with Ferguson. Cable stated that Kelsey and Marriott quickly returned to the car with a purse and, he later learned, with jewelry. At the end of his direct testimony, Cable reiterated that Marriott was with him when he entered the McCreary residence.
 {¶ 23} Randy and Dawn Sinclair testified that, on September 28, 2007, they observed a car going up and down Christina Drive several times. Randy Sinclair indicated that the time was approximately 8:30 p.m. As the vehicle approached again, the car stopped, and the front seat passenger said, "Excuse me." The Sinclairs approached the vehicle, and they could smell a strong odor of alcohol. The front seat passenger asked them for directions to John Street. The Sinclairs gave directions (two or three times) to John Street in the Honey Creek Mobile Home Park, and they heard a man in the back seat repeatedly say, "I told you that was right." After a brief "commotion" in the car, the vehicle drove off. The Sinclairs indicated that sheriffs deputies came to Christina Drive approximately 15 minutes later to investigate the burglary of the McCrearys' home.
 {¶ 24} A few days later, Detective Brumfield asked the Sinclairs to view several photo arrays. Both of the Sinclairs identified Marriott and Cable as individuals who had been in the vehicle; they were unable to identify the individual who had been seated in the rear passenger seat.
 {¶ 25} In his defense, Marriott presented the testimony of Susan Anderson, the mother *Page 8 
of his "officially, not officially" fiance, Brandy, and Billy Anderson, Brandy's brother. Susan Anderson testified that Marriott sometimes resided at her house with Brandy and that, on September 28, 2007, he had come to her house around 7:30 p.m. Ms. Anderson stated that Marriott was waiting to be picked up by Billy so that they could go to Huber Heights and meet Brandy. She stated that Marriott and Billy left together at approximately 9:15 p.m. Ms. Anderson indicated that Marriott did not appear to be intoxicated. Billy Anderson also testified that he picked up Marriott from his mother's house at approximately 9:00 p.m. on September 28, 2007, and went to a friend's house in Huber Heights. Billy testified that they remained together until approximately midnight. On cross-examination, Susan and Billy Anderson both acknowledged that they never informed the police that Marriott was with them at the time of the offenses, even though they both knew of his arrest and the allegations against him.
 {¶ 26} Construing the evidence in the light most favorable to the State, we find sufficient evidence to support Marriott's convictions for aggravated burglary. Betty McCreary testified that three men were involved in the burglary. Although the State's most significant evidence of Marriott's involvement in the burglary was the testimony of Marriott's alleged accomplices, Cable and Kelsey, the two men provided substantially similar accounts of their drinking prior to the burglary, of their conversation with the Sinclairs prior to the burglary, of the burglary itself, and of Marriott's involvement. Cable thus corroborated Kelsey's testimony that Marriott had been a participant in the aggravated burglary, and vice versa.
 {¶ 27} In addition, the Sinclairs' testimony was consistent with Cable's and Kelsey's testimony that they and Marriott had driven by the McCrearys' residence prior to the burglary and that they had stopped to talk with the McCrearys' neighbors regarding directions. Randy *Page 9 
Sinclair placed Marriott in a vehicle with Cable at approximately 8:30 p.m., and the Sinclairs testified that deputies responded to the McCrearys' residence approximately fifteen minutes later. This was consistent with evidence that the 911 call was received at 8:47 p.m. In short, the State's evidence was more than sufficient to establish that Marriott participated in the aggravated burglary of the McCrearys' home with Kelsey and Cable.
 {¶ 28} The jury also did not clearly lose its way and create a manifest miscarriage of justice in convicting Marriott of aggravated burglary. Although Marriott presented two alibi witnesses who testified that he was at the Andersons' home between 7:30 p.m. and 9:00 p.m. and was with Billy Anderson between 9:00 p.m. and midnight on September 28, 2007, the jury was free to credit the testimony of the McCrearys, Kelsey, Cable, and the Sinclairs and to disregard the testimony of the Andersons. If the jury credited the testimony of the State's witnesses, as it was entitled to do, it could have reasonably concluded that Marriott was guilty of aggravated burglary. Marriott's convictions were not against the manifest weight of the evidence.
 {¶ 29} The first assignment of error is overruled.
 III {¶ 30} Marriott's second assignment of error states:
 {¶ 31} "THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO IMPOSE A SENTENCE ON APPELLANT THAT WAS CONSISTENT WITH SENTENCES IMPOSED FOR SIMILAR CRIMES COMMITTED BY SIMILAR OFFENDERS."
 {¶ 32} In his second assignment of error, Marriott claims that the trial court erred in failing to impose a sentence that was consistent with the sentences imposed on Kelsey and *Page 10 
Cable. Marriott notes that Kelsey, who committed the violence against the McCrearys, received a sentence of four years. (At trial, Kelsey stated that he received three years for the burglary and one year for a post-release control violation, to be served consecutively.) Although Cable had not yet been sentenced when Marriott's sentencing hearing occurred, Marriott indicates that he received a four-year sentence. Comparing his sentence with those of his accomplices, Marriott asserts that his eight-year sentence is inconsistent with other sentences for the same offense, contrary to R.C. 2929.11(B).
 {¶ 33} R.C. 2929.11(B) requires that the sentence imposed for a felony "be reasonably calculated to achieve the two overriding purposes of felony sentencing [, i.e., to protect the public from future crime by the offender and others and to punish the offender], commensurate with and not demeaning to the seriousness of the offender's conduct and its impact upon the victim, and consistent with sentences imposed for similar crimes committed by similar offenders."
 {¶ 34} Unless otherwise required by R.C. 2929.13 and R.C. 2929.14, the trial court has discretion "to determine the most effective way to comply with the purposes and principles of sentencing set forth in section 2929.11 of the Revised Code." R.C. 2929.12(A). In exercising that discretion, however, the court must consider factors relating to the seriousness of the conduct and to the likelihood of the offender's recidivism, as set forth in R.C. 2929.12(B)-(E). The trial court may also consider any other factors that are relevant to achieving the purposes and principles of sentencing. R.C. 2929.12(A).
 {¶ 35} In State v. Kalish, 120 Ohio St.3d 23, 2008-Ohio-4912, the Supreme Court of Ohio established a two-step procedure for reviewing a felony sentence. "The first step is to *Page 11 
`examine the sentencing court's compliance with all applicable rules and statutes in imposing the sentence to determine whether the sentence is clearly and convincingly contrary to law.'" State v. Stevens,179 Ohio App.3d 97, 2008-Ohio-5775, at ¶ 4, quoting Kalish at ¶ 4. "If this step is satisfied, the second step requires that the trial court's decision be `reviewed under an abuse-of-discretion standard.'" Id.
 {¶ 36} Although Marriott asserts that his sentence was contrary to law, his sentence for each count of aggravated burglary was eight years, which is within the permissible statutory range for a first degree felony. See R.C. 2929.14(A)(1) ("For a felony of the first degree, the prison term shall be three, four, five, six, seven, eight, nine, or ten years.").
 {¶ 37} As stated above, a felony sentence must also be "consistent with the sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). "`Consistency, however, does not necessarily mean uniformity. Instead, consistency aims at similar sentences. Accordingly, consistency accepts divergence within a range of sentences and takes into consideration a trial court's discretion to weigh relevant statutory factors. * * * Although offenses may be similar, distinguishing factors may justify dissimilar sentences.' State v.Battle, Franklin App. No. 06AP-863, 2007-Ohio-1845, at ¶ 24, quotingState v. King, Muskingum App. No. CT06-0020. 2006-Ohio-6566, at ¶ 23.
 {¶ 38} "Therefore, a consistent sentence is not derived from a case by case comparison; rather, the trial court's proper application of the statutory sentencing guidelines ensures consistency. State v. Hall, Franklin App. No. 08AP-167, 2008-Ohio-6228, at ¶ 10. Indeed, appellate courts have rejected consistency claims where one person involved in an offense is punished more severely than another involved in the same offense. See id. at ¶ 7-11; State v. *Page 12 Ashley, Lake App. No. 2006-L-134, 2007-Ohio-690, at ¶ 28-29. Additionally, we note there is no requirement that co-defendants receive equal sentences. Hall, at ¶ 10, citing State v. Templeton, Richland App. No. 2006-CA-33, 2007-Ohio-1148, at ¶ 98; State v. Brewer, Ashtabula App. No. 2008-A-0005, 2008-Ohio-3894, at ¶ 19.
 {¶ 39} "Accordingly, in order to demonstrate that a sentence is inconsistent, a defendant cannot simply present other cases in which a person convicted of the same offense received a lesser sentence.Battle, at ¶ 23. Rather, a defendant claiming inconsistent sentencing must show that the trial court failed to properly consider the statutory sentencing factors and guidelines found in R.C. 2929.11 and 2929.12.State v. Holloman, Franklin App. No. 07AP-875, 2008-Ohio-2650, at ¶ 19."State v. Hayes, Franklin App. No. 08AP-233, 2009-Ohio-1100, at ¶ 8-10.
 {¶ 40} Although the trial court did not expressly state that it had considered the principles and purposes of sentencing under R.C. 2929.11
and the seriousness and recidivism factors under R.C. 2929.12, we must presume that the trial court properly considered the factors set forth in R.C. 2929.11 and R.C. 2929.12. State v. Latham, Champaign App. No. 07-CA-23, 2008-Ohio-4734, at ¶ 11; Kalish at ¶ 18, n. 4. The court informed Marriott that "[t]here are a number of things that the Court needs to balance in this case." The trial court stated that it was aware of the serious nature of the offense, of the effect on the victims, and that the person who had caused the injuries was Kelsey. The trial court noted that "a different court has imposed a sentence of four years is how it's been represented to this Court" on Kelsey for the burglary. The trial court further stated that it had to balance the fact that Marriott had not previously served a prison term. The court discussed with Marriott that he had two felony convictions for aggravated assault and possession of cocaine, for which he was on community control at the *Page 13 
time of the aggravated burglary, and that "probation" would not be imposed in this case. Based on the record of the sentencing hearing, we find no basis to conclude that the trial court failed to properly consider the principles and purposes of sentencing under R.C. 2929.11
and the seriousness and recidivism factors under R.C. 2929.12 when it sentenced Marriott to eight years.
 {¶ 41} After informing Marriott of his sentence, the trial court advised him that, after he is released from prison, he would be placed on post-release control for five years. The trial court thus also complied with the statutory mandate to impose post-release control. SeeState v. Boswell, — Ohio St.3d-, 2009-Ohio-1577, at ¶ 8 (noting that "sentences that fail to impose a mandatory term of postrelease control are void").
 {¶ 42} Because the record establishes that the trial court complied with all applicable rules and statutes, Marriott's sentence is not contrary to law.
 {¶ 43} As the plurality outlined in Kalish, in addition to determining whether the court was in "compliance with all applicable rules and statutes," the sentence must be reviewed under an abuse of discretion standard. An abuse of discretion is "`more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable.'" Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, quoting State v. Adams (1980), 62 Ohio St.2d 151, 157. Although this is a deferential standard of review, the appellate court nonetheless must examine the reasonableness of the term of imprisonment.
 {¶ 44} In this case, Marriott was convicted of aggravated burglary, a first degree felony. Although Kelsey's sentence was half of Marriott's sentence, Kelsey testified at trial that, as part of his plea agreement for the burglary of the McCrearys' home, he is "[s]erving three years on a third-degree felony burglary." (Emphasis added.) Cable also testified at trial that he had *Page 14 
pleaded guilty to "an amended charge of burglary" in this case. Accordingly, even though Kelsey and Cable engaged in similar conduct to Marriott, they were not sentenced for similar offenses.
 {¶ 45} Moreover, Kelsey and Cable agreed to assist the State, and their testimony (as emphasized in Marriott's first assignment of error) was critical to the State's case in that their testimony alone placed Marriott inside the McCrearys' home. In addition, the record reflects that Kelsey, at least, was sentenced by a different trial judge, who did not hear the evidence presented at Marriott's trial.
 {¶ 46} We recognize that many of the aggravating factors noted by the trial court are equally, if not more, applicable to Marriott's co-defendants. Kelsey and Cable had more extensive criminal records than Marriott and had previously served time in prison; Kelsey was on post-release control at the time of the burglary. Although Marriott's record and his behavior during the burglary were no worse than his co-defendants', Kelsey's and Cable's pleas and their cooperation after their apprehension resulted in leniency to which Marriott was perhaps not entitled and did not receive. The trial court's sentence was not indicative of an unreasonable, arbitrary or unconscionable attitude and did not constitute an abuse of discretion.
 {¶ 47} The second assignment of error is overruled.
 IV {¶ 48} The judgment of the trial court will be affirmed.
GRADY, J. and WOLFF, J., concur.
(Hon. William H. Wolff, Jr., retired from the Second District Court of Appeals, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).
Copies mailed to:
Amy M. Smith
Jeffrey T. Gramza
Hon. Richard P. Carey *Page 1